UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| WILLIE L. SMITH, | ) | Civil Action No.: 4:11-cv-2039-MGL-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| CITY OF MARION and RODNEY BERRY; | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This employment discrimination case arises out of Plaintiff's employment with the City of Marion as its Police Chief.  Plaintiff alleges violations of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq., the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601, et seq. and the South Carolina Human Affairs Law (SCHAL), S.C. Code Ann. § 1-13-10, et seq.[1] Presently before the Court is Defendants' Motion for Summary Judgment (Document # 36).[2]  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

---

[1]In footnote 8 of his Response, Plaintiff abandons his claim under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 and his state common law causes of action for wrongful discharge in violation of public policy and defamation.

[2]Defendant Rodney Berry previously filed a Motion to Dismiss, which was granted in part and denied in part.  Specifically, the Motion was granted with respect to Plaintiff's claims against Berry under Title VII, the ADA, the FMLA, and the SCHAL and denied with respect to Plaintiff's claims against Berry for wrongful discharge and defamation.  Because Plaintiff has now abandoned his state common law claims for wrongful discharge and defamation, dismissal of Defendant Berry is appropriate.

## II.    FACTS

Plaintiff began his career as a City police officer on July 1, 1971. Plaintiff Dep. p. 11. On February 11, 1991, Plaintiff received a promotion to the position of Chief of Police of the City and held this position until his termination on October 18, 2010. Compl. ¶ 7. Prior to the Mayor coming into office in April 2009, Plaintiff never received a verbal or written warning for poor job performance, a disciplinary action for improper conduct, or a negative performance review during his employment with the City. Plaintiff Dep. p. 12; Berry Dep. pp. 12, 43.

In 2009, longtime Mayor of Marion Bobby Gerald was replaced by a new Mayor: Rodney Berry. Berry Dep. p. 12. Mayor Berry (with council approval where necessary) instituted many changes including hiring a new City Administrator, introducing performance reviews, and selling the water and sewer system. Berry Dep. pp. 20, 25. Mayor Berry testified that several incidents within the City police department caused him some concern. Id. p. 29. An officer had been accused of going to the home of a woman he had ticketed earlier in the day and raping her. Id. p. 29. Another officer allegedly hid a bench warrant so that a friend of his did not get arrested. Id. pp. 29-30. In addition, the circuit solicitor publicly accused the Marion police department of mishandling evidence and causing the dismissal of a murder case. Plaintiff Dep. pp. 31-32. As a result, the Mayor testified he was concerned that morale in the Department was low. Id. p. 31. He received complaints from officers regarding the leadership of the Department. Id. Some officers indicated that another officer had been singled out[3] for discipline, and the City grievance committee reversed the Chief's discipline of this officer. Id. p. 34. The Mayor also was unhappy that the Chief failed to write a letter in support of closing a nuisance business, Id. p. 104, that he allowed employees to bring children into the department, Id. p. 105, and that other council members were unhappy with the operation of the

---

[3]Mayor Berry testified that the officers described it as a "vendetta." Berry Dep. p. 34.

department. Id. at 81.

Mayor Berry provided Plaintiff with his first ever negative performance review for the year 2010, even though the Mayor had not yet been in office a full year and even though Plaintiff never received a warning for poor job performance on any prior occasion. Berry Dep. p. 23; Exhibit #1 to Deposition of Davis: Notes Taken by Mason (attached as Ex. 70 to Plaintiff's Response); Mason Dep. p. 8; Plaintiff Dep. p. 12.

The City of Marion operates under the strong-Mayor form of government and, therefore, under S.C. Code Ann. 5-9-30, the Mayor has exclusive authority to hire and fire the Chief of Police. Knowing that the Chief planned to retire in August 2011, Berry Dep. p. 105, the Mayor discussed with Plaintiff three other positions within the City in which the Mayor believed Plaintiff would be interested. Plaintiff Dep pp. 35-36.[4] The Mayor offered to create a Public Safety Director position and move the Chief over the Fire and Police Departments. The Mayor felt this would allow him to make changes and provide a transition period. Berry Dep. p. 81. However, the Mayor lacked the authority to create a public safety department or a position of public safety director on his own. Plaintiff Dep. pp. 36, 53; Ficik Dep. pp. 101-102; Berry Dep. p. 82. The Mayor also asked if Plaintiff would be interested in becoming the municipal judge. Again, the Mayor lacked the authority to install Plaintiff into such position without the approval of City Council. Plaintiff Dep. p. 36; Ficik Dep. p. 109. Additionally, the Mayor offered Plaintiff a position as an assistant to the city administrator, Bob Anderson. Plaintiff Dep. p. 35. When the Mayor discussed this position with Plaintiff, the position in question had not yet been created and would likely have required the approval of City Council. Id.

During two face to face meetings with the Mayor, Plaintiff recalls the Mayor urging him to

---

[4]The Order in which the Mayor offered these positions to Plaintiff appears to be in dispute.

resign from the position of Chief of Police because Plaintiff was in his "twilight years," he was "not as young as [he] used to be," and because the Chief of Police position needed "some younger, fresher blood." Plaintiff Dep. pp. 36, 52-53, 59. Plaintiff declined a transfer to any other positions and remained in the position of Chief of Police.  Plaintiff Dep. p. 36.

Plaintiff argues that when the Mayor came into office, it signaled a change, not just for Plaintiff, but for the entire African American community of the City, which constitutes a majority of the City's population. Davis Dep. p. 25.  Plaintiff asserts that "two separate swearing-ins, one for the whites and one for the blacks," were held following the Mayor's election. Davis Dep. pp. 21, 28-29. According to Councilman Bobby Davis, "[t]hat was the first time in the history of Marion that I know that we had two swearing-ins."  Davis Dep. p. 21.  Davis testified that he believed it was the Mayor's decision to have two swearing-in ceremonies, but he did not know why he made such a decision, although the Mayor told him it was an oversight.  Davis Dep. p. 29.  Defendants argue that the two ceremonies occurred only because it was not anticipated that the incumbents would have a swearing-in ceremony.  The Mayor avers that his election occurred under unusual circumstances because the previous Mayor, Bobby Gerald, died in office approximately two and a half weeks prior to the mayoral election in which Gerald was seeking his seventh term.  Berry Aff. ¶ 2 (attached as an Ex. to Defendants' Reply).  Thus, when elected through a write-in campaign, Mayor Berry had no plans for and was unaware of any official protocol regarding his swearing-in ceremony.  Id. Mayor Berry learned that Betsy Atkinson, the only other newly elected official, was being sworn-in by her uncle and the Mayor asked to be a part of that ceremony.  Id.[5]

Plaintiff also asserts that the Mayor planned to replace the attorneys retained by the City, who

---

[5]There is no evidence that the incumbents asked to join the swearing-in ceremony of the Mayor and Betsy Atkinson or that they offered the Mayor and Betsy Atkinson to participate in their ceremony.

-4-

happened to be black, and the attorneys thus decided to resign. Davis Dep. p. 22. The Mayor avers that he was concerned about excessive fees and travel expenses for the out-of-town law firm and was personally in favor of hiring a local attorney for easy access, although the ultimate hiring decision was made by City Council. Berry Aff. ¶ 5.

Plaintiff further argues that the Mayor also "has not hired anyone of color to any department head position or department level job since he became mayor,"even though qualified African Americans have applied for such positions. Davis Dep. pp. 25, 33-34, 36-37. Defendants assert that the Mayor has promoted or hired or approved the promotion or hiring of numerous African-Americans, including Cindy Barr, who was the first African-American female to be promoted to the position of Police Captain in the City. Berry Aff. ¶ 6. Berry avers that he nominated and supported an African-American candidate for the position of Municipal Judge although he did not receive enough votes from other members of City Council. Id. Berry further avers that he was Mayor when twenty African Americans were hired and he approved the hiring of seven African American police officers. Id.

The Mayor accepted several of Plaintiff's hiring recommendations, including his recommendations to hire five African-American candidates, four Caucasian candidates and one Hispanic candidate. Berry Aff. ¶ 6; Ficik Dep. pp. 75-77. However, Plaintiff points to two instances in which the Mayor did not accept his recommendations. First, Elizabeth Ficik, who is responsible for handling personnel matters for the City, recalls the Mayor being involved in hiring a white police officer named Carl Stokes. Ficik Aff. ¶ 1; Ficik Dep. pp. 77-78. Plaintiff urged the Mayor to not hire Stokes because he was a game warden and had no experience as a traffic enforcement officer. Plaintiff pp. 32-33, 62. The Mayor hired Stokes anyway. Plaintiff Dep. pp. 32-33. The Mayor also refused to allow Plaintiff to hire Dwayne Tinney, a qualified African American police officer. Ficik

Dep. pp. 113-114; Plaintiff Dep. p. 24, 33.

Plaintiff asserts that, under the Mayor's leadership, almost every issue that comes before City Council is resolved by a four to three vote, with the Mayor and the three white City Council members voting together and the three African American City Council members voting together. Davis Dep. p. 36. The Mayor disputes this characterization of the City Council votes. He asserts that the majority of council votes are unanimous, but he admits that there have been numerous occasions where split voting has occurred under both his administration and that of the previous Mayor. Berry Aff. ¶ 4.[6]

On September 27, 2010, Plaintiff began experiencing medical problems that required him to visit his doctor, James R. Carroll, M.D. Carroll Dep. p. 9. Dr. Carroll diagnosed Plaintiff as suffering from the serious health condition of congestive heart failure and recommended that Plaintiff be hospitalized to undergo heart related testing. Carroll Dep. pp. 10-13; Ficik Dep. p. 57. In late September 2010, Plaintiff called and notified the Mayor and the city administrator that he was being hospitalized for heart related issues and necessary testing. Ficik Dep. p. 58. Ultimately, because of Plaintiff's medical condition, Dr. Carroll wrote two notes excusing Plaintiff from work from September 27, 2010 through November 12, 2010. Exhibits #1-2 to Carroll Dep. (attached as Exs. 74 and 75 to Plaintiff's Response).

The City was aware that Dr. Carroll excused Plaintiff from work from September 27, 2010 through November 12, 2010. Ficik Dep. pp. 42-43. In fact, according to Ficik, who is responsible

---

[6]Mayor Berry opines that, "after reviewing the minutes, it is my perception that the split votes are not racially motivated but an attempt by Council to undermine the authority of the Mayor under our strong Mayor form of government. Several years ago, Council Member Bobby Davis spearheaded an attempt to change the form of government but the referendum was not approved by voters in the City of Marion with an overwhelming majority voting against the measure." Berry Aff. ¶ 4.

for administering the City's FMLA policy, "[t]he City considered [Plaintiff] to be on FMLA leave" effective "sometime in late September" 2010. Ficik Dep. p. 19, 40-41. Ms. Ficik further testified that Plaintiff was on FMLA leave when the City terminated him. Ficik Dep. p. 43.[7]

Defendants assert that the events that transpired during a City Council meeting on October 12, 2010, resulted in Plaintiff's termination. The details regarding that meeting are largely in dispute. Plaintiff asserts that prior to the City Council meeting on October 12, 2010, and while still on FMLA leave, he asked the Mayor if he could be put on the agenda for executive session to discuss a personnel matter with the Mayor and City Council. Plaintiff Dep. p. 30. Defendants assert that Plaintiff informed someone (possibly the City Clerk) that he wished to be placed on the agenda to speak to City Council. Berry Dep. pp. 57-60. Defendants assert that the Mayor learned of this request and called Plaintiff to find out why he wanted to address City Council. Id. Because the Mayor was Plaintiff's immediate supervisor, the Mayor wanted to make sure Plaintiff talked to him first about any police department issues. Id. Defendants assert that Plaintiff informed the Mayor that he wanted to update City Council on his health status. Berry Dep. p. 60. Plaintiff asserts that he

---

[7]Even though Ficik and the City considered Plaintiff to be on FMLA leave effective late September 2010, the City never explained to Plaintiff his rights under the FMLA, either verbally or in writing. Ficik Dep. pp. 37-38. For other employees who were eligible for FMLA benefits, including James W. Gray, Jr., who is white and who replaced Plaintiff as Chief of Police, the City sent a standard two-page memorandum explaining the employee's rights under the FMLA. Ficik Dep. p. 37, 50-51, 53-54; Exhibit #2 to Ficik Dep. (attached as Ex. 58 to Plaintiff's Response). The City did not send this information to Plaintiff. Ficik Dep. p. 37. For Plaintiff, Ficik engaged in one telephone conversation with Plaintiff on October 7, 2010, which Plaintiff initiated. Ficik Dep. p. 39. Ficik describes the telephone conversation as "fairly brief" and asserts that she informed Plaintiff that he was entitled to FMLA benefits but she did not get into any specifics. Ficik Dep. p. 64. Ficik then followed-up with Plaintiff by sending him an email informing him of his sick and vacation allowances and telling him that she would send him the FMLA paperwork. Ficik Dep. pp. 60-61. Ficik never actually sent the paperwork, however, because at the beginning of the following week, Ficik heard from a police officer that Plaintiff was back in the office, thus, she did not know whether he was back at work or still on leave. Ficik Dep. p. 38. Within a week, Plaintiff's employment with the City ended. There is no evidence that Mayor Berry was involved in the failure to provide FMLA paperwork to Plaintiff.

informed the Mayor that he wanted to discuss a personnel matter. Plaintiff Dep. pp. 30-31.

Plaintiff admitted in his deposition that his intent was to discuss several police department controversies. Plaintiff Dep. pp. 42-43. On October 12, 2010, Plaintiff entered executive session with the intent of responding to allegations from the Solicitor's office that the police department's conduct caused a mistrial in a recent murder case. Plaintiff Dep. pp. 31-32. Plaintiff further intended to discuss his dissatisfaction with the Mayor's hiring of two white police officers, Carl Stokes and Eric Walters.[8] Plaintiff Dep. pp. 32-34. Plaintiff also intended to discuss his dissatisfaction with the Mayor's refusal to allow Plaintiff to hire Dwayne Tinney, an African American, as a police officer. Plaintiff Dep. pp. 32-34. According to Councilman Michael Baker, these were appropriate topics for Plaintiff to discuss during executive session. Baker Dep. pp. 16-17.

When Plaintiff arrived at the October 12, 2010, City Council meeting, he had one or two citizens with him. Because the meeting was scheduled during an executive session, Plaintiff was told he could not bring the citizens into the executive session. According to the Mayor, Plaintiff became mad, yelled at the citizens that they could not come in, and slammed the door. Berry Dep. p. 69. The Mayor also asserts that Plaintiff began to complain about the Mayor not allowing him to hire his own officers. Berry Dep. pp. 69-70. According to the Mayor, he tried to tell Plaintiff that the matters he was raising were police department matters that he first needed to address with him. Id. The Mayor asserts that Plaintiff was loud and angry and, at one point, forcefully tried to take papers out of his hands. Id. Council members Betsy Atkinson and Ron Atkinson confirm the Mayor's account of these events and describe Plaintiff as insubordinate and disrespectful toward the

---

[8]Plaintiff previously wrote up Eric Walters for "failing to do his job" as a police officer. Plaintiff Dep. p. 34. After being written up, Mr. Walters quit. Id. When Walters returned and requested his job back, Plaintiff refused. Id. The Mayor then hired Walters back as a police officer, despite Plaintiff's refusal. Id.

Mayor.  See Betsy Atkinson Affidavit (attached as Ex. 4 to Defendants' Motion); Ron Atkinson Affidavit (attached as Ex. 5 to Defendants' Motion).  The Mayor subsequently asked Plaintiff to leave the meeting.  Berry Dep. p. 70.

Plaintiff and Council members Bobby Davis and Michael Baker dispute the Mayor's and the Atkinsons's account of what occurred during the meeting.  They assert that Plaintiff was not able to discuss the issues he intended to discuss during the meeting because the Mayor and two other white council members constantly interrupted him.  Baker Dep. pp. 7-8, 17-19; Davis Dep. p. 7.  Baker asserts that the conduct of the Mayor and the other white council members who interrupted Plaintiff was rude, disrespectful and inappropriate.  Baker Dep. p. 17.  Plaintiff and Davis aver that Plaintiff never raised his voice during the meeting other than to be heard when the Mayor or others were interrupting him.  Plaintiff Dep. pp. 43-44, 47-48; Davis Dep. p. 7.  Baker further asserts that he did not witness Plaintiff grab any papers from the Mayor's hands.  Baker Dep. p. 8.  Baker and Davis agree that Plaintiff's conduct during the October 12, 2010, meeting did not justify his termination and was not insubordinate, disrespectful or inappropriate.  Baker Dep. p. 8; Davis Dep. p. 7.

After Plaintiff was asked to leave the meeting, Baker remembers the Mayor saying, "I could feel the redneck crawling up my back. And the only way you settle that is to take it outside." Baker Dep. p. 9.

Following the October 12, 2010, meeting, the Mayor decided that he and Plaintiff could not work together anymore. He called Plaintiff the following week and arranged a meeting, along with Ficik and Alan Ammons, the City Administrator.  Berry Dep. p. 90.  The Mayor asserts that the first thing he asked Plaintiff in the meeting was whether Plaintiff thought they could work together anymore. Berry asserts that Plaintiff agreed they could not. Berry Dep. pp. 70-71. Plaintiff testified he could not recall if the Mayor said this or not.  Plaintiff Dep. p. 51.  During this meeting, the

Mayor terminated Plaintiff.  Berry Dep. p. 90.  The Mayor and Ficik testified that the only reason

for Plaintiff's termination was because of his conduct during the October 12, 2010, meeting.  Berry

Dep. p. 87; Ficik Dep. p. 95.  Plaintiff was not issued a disciplinary action regarding his conduct at

the meeting.  Ficik Dep. pp. 86-87.  The City's Personnel Policy Manual provides that "[i]n all

disciplinary cases the employee must receive in reasonable detail written notice of the nature of the

acts or omissions which are the basis for the disciplinary action."  City Personnel Policy Manual  p.

50 (attached as Ex. 57 to Plaintiff's Response).  Ficik testifies that this provision could be interpreted

as requiring a disciplinary notice for Plaintiff's conduct.  Ficik Dep. p. 87.  Ficik acknowledges in

her deposition that the City had issued disciplinary notices to terminated employees in the past but

it is not something that they always do.  Ficik Dep. p. 128; Ficik Affidavit ¶ 2.

Following Plaintiff's termination, the Mayor hired James W. Gray, Jr., a forty-six year old

white male, to replace Plaintiff as Chief of Police.  Berry Dep. pp. 106-07; Gray Medical History

Questionnaire (attached as Ex. 88 to Plaintiff's Response).  The Mayor conceded there was also an

African-American applicant who was well qualified for the position.  Berry Dep. p. 107.

## III.     STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary

judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to

judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Summary judgment is proper if the non-moving party fails to establish an essential element of any

cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317.

Once the moving party has brought into question whether there is a genuine dispute for trial on a

material element of the non-moving party's claims, the non-moving party bears the burden of coming

forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita

Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party

must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could

reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and

inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving

party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may

not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary

judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on

must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."

Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere

allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324.  Rather, the party must present

evidence supporting his or her position by "citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory

answers, or other materials."  Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v.

Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir.

1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

### A.    FMLA

Plaintiff alleges that Defendant terminated his employment in violation of the FMLA.  The

FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave

during any 12-month period . . . [b]ecause of a serious health condition that makes the employee

unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1).  The

FMLA also prohibits an employer from discriminating against an employee for asserting rights under the Act. 29 U.S.C. § 2165(a)(2).  "The FMLA creates two types of claims: (1) interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act; and (2) retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." Gleaton v. Monumental Life Ins. Co., 719 F.Supp.2d 623, 633 n. 3 (D.S.C.2010) (internal citation omitted). Although Plaintiff states in his Response that Defendant "denied [him] the protections afforded by the FMLA by terminating him while on medical leave," Response p. 14, which mimics the language cited above with respect to an interference claim, Plaintiff cites law relevant to a claim for retaliation under the FMLA, and it appears that Plaintiff intends to assert such a claim.

Retaliation claims under the FMLA are evaluated under the McDonnell Douglas[9] burden-shifting framework.  Perry V. Computer Sciences Corp., 429 Fed.Appx. 218, 221 (4th Cir. 2011). To establish a prima facie case of retaliation under the FMLA, Plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse action against him, and (3) the adverse action was causally connected to the plaintiff's protected activity.  Yashenko v. Harrah's N.C. Casino Co., LLC, 446 F.3d 541, 551 (4th Cir.2006) (citing Cline v. Wal–Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir.1998)). Here, it is undisputed that Plaintiff made use of leave time pursuant to the FMLA and that he suffered an adverse employment action when his employment was terminated. Defendant argues that Plaintiff fails to show a causal connection between his FMLA leave and his termination.  However, the temporal proximity between the time Plaintiff began his FMLA leave (late September 2010) and the time of his termination (October 18, 2010) is sufficient to establish

---

[9]McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

a causal connection between the two events.  See Yashenko, 446 F.3d at 551 (citing Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir.1989)).  Thus, Plaintiff has presented sufficient evidence to establish a prima facie case of retaliation in violation of the FMLA.

Because Plaintiff has met his burden of establishing a prima facie case of retaliation, the burden shifts to Defendant to produce a non-retaliatory explanation for Plaintiff's termination. Yashenko, 446 F.3d at 551 (citing Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir.2001)). Defendant contends that it terminated Plaintiff due to his inappropriate and insubordinate conduct during the City Council meeting on October 12, 2010.  Therefore, the burden returns to Plaintiff to present sufficient evidence that Defendant's proffered explanation is pretext for FMLA retaliation.  Id.

Once a defendant meets its burden of producing a legitimate, non-retaliatory reason for the adverse action, "'the McDonnell Douglas frame-work–with its presumptions and burdens–disappear[s], and the sole remaining issue [is] discrimination vel non.'"  Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir.2007) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).  Accordingly, the plaintiff's burden of demonstrating pretext "'"merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination."'"  Id. (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); see also Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 (4th Cir.2005).  In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reasons, but was pretext for retaliation. Reeves, 530 U.S. at 143.  Throughout the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendant intentionally retaliated against Plaintiff remains at all

times with Plaintiff.  Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude Defendant intentionally retaliated against him.

Plaintiff argues that Defendant's reason for terminating his employment is pretext for a retaliatory reason.  Plaintiff asserts that, if Defendant terminated Plaintiff for violating provisions of the City Personnel Policy at the October 12, 2010 meeting, the City should have issued a discipline notice to Plaintiff.  The fact that no disciplinary notice was issued to Plaintiff, he argues, places doubt on the given reason for his termination.  Ficik admits that the Personnel Policy could be interpreted as requiring a disciplinary notice prior to termination but asserts that one is not always given.

Plaintiff also argues that, according to Baker, Davis, and himself, who were all present during the October 12, 2010, council meeting, Plaintiff did not act in an insubordinate, disrespectful or inappropriate manner.  Defendant has presented evidence that Plaintiff's actions were disrespectful and insubordinate, and, thus, a dispute of fact exists as to Plaintiff's behavior during this meeting.  A dispute of fact exists as to what occurred at the council meeting.  Baker asserts that it was the Mayor and the other white council members, not the Plaintiff, who were rude, disrespectful and inappropriate by interrupting Plaintiff as he was attempting to address council.  Plaintiff and Davis aver that Plaintiff never raised his voice during the meeting other than to be heard when the Mayor or others were interrupting him.  The record reflects that the Mayor did not find the topics raised by Plaintiff during the meeting to be appropriate and that he told Plaintiff during the meeting that they were not appropriate.  However, according to Baker, the police department issues raised by Plaintiff during the meeting were appropriate topics for Plaintiff to discuss during executive session.  There is nothing else in the record defining the parameters of what is or is not appropriate to bring up during executive session.  Thus, a dispute of fact exists here, as well.

Accordingly, an issue of fact exists as to whether the reason given for Plaintiff's termination was the true reason for the termination. However, courts do not sit as "super personnel departments second guessing" employment decisions. Malghan v. Evans, 118 F. App'x 731, 733 (4th Cir.2004) (citing Smith v. Univ. of N. Carolina, 632 F.2d 316, 346 (4th Cir.1980)). In fact, "the law does not require an employer to make, in the first instance, employment choices that are wise, rational, or even well-considered, as long as they are nondiscriminatory." Id. (citing Powell v. Syracuse Univ., 580 F.2d 1150, 1156–57 (2d Cir.1978). Thus, the evidence advanced by Plaintiff to establish pretext must be sufficient to create an issue of fact not only as to whether the legitimate reason produced by Defendant is not its true reason, but also whether the reason was pretext for retaliation. Here, the evidence reveals that Plaintiff was terminated less than one month after he began his FMLA leave. Close temporal proximity can serve as evidence of pretext. See, e.g., Warren v. Halstead Indus., Inc., 802 F.2d 746, 758 (4th Cir.1986) (noting that close temporal proximity, here thirteen days, combined with other relevant evidence can give rise to an inference of pretext); Moss v. City of Abbeville, 740 F.Supp.2d 738, 746 (D.S.C.2010) (holding that sufficiently close temporal proximity, here three months, may give rise to an inference of pretext); Blasic v. Chugach Support Servs., Inc., 673 F.Supp.2d 389, 400 (D.Md.2009) (finding that an adverse employment action closely following protected activity, here one week, is one of several factors which, when combined, may support an inference of pretext). Therefore, in light of the issues of fact regarding what took place during the October 12, 2010, city council meeting and the temporal proximity between Plaintiff's FMLA leave and his termination, a dispute of fact exists as to whether Plaintiff's termination was in retaliation for his protected activity under the FMLA. Thus, it is recommended that Defendant's Motion for Summary Judgment be denied as to Plaintiff's FMLA claim.

**B.    Title VII and the SCHAL**

Plaintiff also argues that Defendant terminated Plaintiff because of his race and his age in violation of Title VII and the South Carolina Human Affairs Law (SCHAL).  Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1).  The SCHAL provides that it is unlawful to discharge an individual from employment based upon, inter alia, the individual's age.  S.C. Code Ann. § 1-13-80(A)(1).  "Because there is little case law interpreting the SCHAL and because the SCHAL essentially follows the [Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.] both procedurally and substantively in relevant respects, the Court will apply case law interpreting the ADEA to plaintiff's age discrimination claim."  Taylor v. Cummins Atlantic, Inc., 852 F.Supp. 1279, 1283 (D.S.C. 1994) (citing Orr v. Clyburn, 277 S.C. 536, 290 S.E.2d 804, 806 (1982) (holding that Title VII cases "are certainly persuasive if not controlling in construing the [SCHAL]")).

As with his FMLA claim, Plaintiff proceeds under the McDonnell Douglas burden-shifting with respect to his race and age claims as well.[10]  As discussed above, Plaintiff has the initial burden of establishing a prima facie case of discrimination.  Id.  To establish a prima facie case of race or age discrimination in a termination case, the plaintiff must present facts showing that (1) he is a

---

[10]The Supreme Court noted that it "has not definitively decided" whether the McDonnell Douglas framework, first developed in the context of Title VII cases, "is appropriate in the ADEA context." Gross v. FBL Financial Services, Inc., --- U.S. ----, 129 S.Ct. 2343, 2349 n.2, 174 L.Ed.2d 119 (2009). In the absence of further direction from the Supreme Court, the undersigned must follow Fourth Circuit precedent, which applies the McDonnell Douglas framework to ADEA claims. See Hill, 354 F.3d at 285; see also Bodkin v. Town of Strasburg, 2010 WL 2640461 at *4-5 (4th Cir. June 29, 2010) (continuing to apply the McDonnell Douglas framework following the Gross opinion).

member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F. 3rd 277, 285 (4th Cir. 2004). With respect to age discrimination, the Supreme Court has held that "the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 313, 116 S.Ct. 1307 (1996). The fourth element can also be established by presenting evidence raising an inference of discrimination. See Miles v. Dell, Inc., 429 F.3d 480, 486–87 (4th Cir.2005); EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851 n. 2 (4th Cir.2001) (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Defendant assumes for purposes of this motion that Plaintiff has presented sufficient evidence to establish a prima facie case of race and age discrimination but argues that Plaintiff cannot show that Defendant's legitimate, non-discriminatory reason for his termination was pretext for a discriminatory reason.

Again, for the same reasons discussed with respect to Plaintiff's FMLA claim, issues of fact exist as to what occurred during the October 12, 2010, meeting, thus, creating a dispute of fact as to whether the reason given for Plaintiff's termination, i.e, his conduct at the October 12, 2010, city council meeting, was the true reason for his termination. Next, the court must determine whether there is sufficient evidence of race and/or age discrimination to show the reason given for Plaintiff's termination was pretext for a discriminatory reason.

With respect to Plaintiff's age discrimination claim under the SCHAL, viewing the evidence in the light most favorable to Plaintiff, the Mayor made several comments to Plaintiff regarding his

age.  Specifically, Plaintiff testifies that the Mayor stated, while offering to transfer Plaintiff to different positions within the City, that Plaintiff was in his "twilight years" and was "not as young as [he] used to be," and that the Chief of Police position needed "some younger, fresher blood." Plaintiff Dep. pp. 36, 52-53, 59.  Defendant argues that comments about age simply do not have the same negative connotation as do comments about other protected traits, such as race or sex and that comments about age must be viewed in the context in which they were made.  However, the cases cited by Defendant to support this argument are distinguishable.  In EEOC v. Clay Printing Co., 955 F.2d 936, 942 (4th Cir. 1992), the court found that comments such as "dead wood," "too many people have been around here too long and make too much money," and "if employees had been there ten years or more, they needed to move on" were relevant to length of time in service, not necessarily age, and that statements about wanting to attract "newer, younger people" or "young blood" were not probative of age discrimination.  However, the comments in the present case made by the Mayor regarding Plaintiff being in his twilight years and that he was not as young as he used to be are directly related to Plaintiff's age.  Moreover, unlike the present case, the comments in Clay Printing were made generally and not specifically directed towards any one person, whereas, here, the age-related comments were made to Plaintiff.  Defendant also points to Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511-12 (4th Cir. 1994), in which the court held that the statement "'there comes a time when we have to make way for younger people' . . . in itself creates no inference of age bias."  However, unlike Birkbeck, the statements at issue here were made in the context of the Mayor attempting to remove Plaintiff from his position as Chief of Police, the position from which he was ultimately terminated, into another position.

    For this same reason, Defendant's argument regarding the context of the age-related comments is unavailing.  Defendant argues that, to the extent any age-related comments were made,

they were made in the context of Plaintiff's upcoming retirement. However, as stated above, Plaintiff asserts that the comments were made while the Mayor was discussing with him his desire to move Plaintiff to a different position within the City. In this context, a reasonable inference could be made that the Mayor felt Plaintiff was too old for the Chief of Police position.

Defendant also argues that the timing of these alleged comments, which occurred in approximately April and June of 2009, is important because they were made long before Plaintiff's termination, in October of 2010. However, the cases cited by Defendant to support this contention are also distinguishable. In <u>Martin v. Orthodontic Center</u>, 93 F.Supp.2d 682, 687 (D.S.C. 1999), the racial comments at issue were made by a co-worker rather than a supervisor and the court also found "a substantial factual basis that the articulated, non-discriminatory reasons were credible," unlike here, where issues of fact exist regarding the articulated reason for Plaintiff's termination. The <u>Martin</u> court also characterizes the racial remark as "stray," <u>Id.</u> at 685, whereas here, the age-related comments were made in the context of the Mayor's attempt to remove Plaintiff from his position. The other cases cited by Defendant are inapposite as well because they do not address comments made by an employer regarding a protected trait, but, rather, the timing of an adverse action in relation to protected activity in the context of retaliation claims. <u>See Carter v. Ball</u>, 33 F.3d 450 (4th Cir.1994); <u>Williams v. Cerberonics</u>, 871 F.2d 452 (4th Cir.1989); <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739 (11th Cir.1996); <u>Bourger v. Eaton Corp.</u>, 114 F. Supp. 2d 412, 420-21 (W.D.N.C. 2000) aff'd, 230 F.3d 1351 (4th Cir. 2000).

In sum, Plaintiff has presented evidence that, when viewed as a whole, gives rise to a genuine dispute of fact as to whether Plaintiff was terminated because of his age, namely, the factual dispute regarding Plaintiff's conduct during the October 12, 2010, city council meeting and the age related comments made by the Mayor in the context of attempting to remove Plaintiff from his position as

-19-

the Chief of Police. Viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that Plaintiff was terminated because of his age. Thus, it is recommended that summary judgment be denied as to Plaintiff's age discrimination claim under the SCHAL.

Finally, the court must determine whether Plaintiff has presented sufficient evidence of race discrimination that could allow a jury to conclude that his termination was based upon his race. Unlike the age comments Plaintiff asserts the Mayor made, Plaintiff testifies that he never heard the Mayor make a racist remark nor does he have any knowledge of the Mayor making racist remarks. Pl. Dep. pp. 54-55. However, Plaintiff argues that the Mayor "has taken a number of racially discriminatory actions against African Americans." Pl. Response p. 4. He asserts that two swearing-in ceremonies were held upon the Mayor's election, one for whites and one for blacks. The Mayor explains that this occurred only because the other newly elected official, Betsy Atkinson, a white female, had already made plans to be sworn in by her uncle and the Mayor asked to join in her ceremony because he was a last minute, write-in candidate and had not made arrangements for a swearing-in ceremony. The Mayor was not aware that the incumbent officials, who happened to be African-American, would have a swearing-in ceremony. There is no evidence that the incumbents asked to join the swearing-in ceremony of the Mayor and Betsy Atkinson or that they offered the Mayor and Betsy Atkinson to participate in their ceremony.

Plaintiff also asserts that the Mayor planned to replace the attorneys retained by the City, who happened to be black, and the attorneys thus decided to resign. The Mayor avers that he was concerned about excessive fees and travel expenses for the out-of-town law firm and was personally in favor of hiring a local attorney for easy access, although the ultimate hiring decision was made by City Council.

Plaintiff also argues that the Mayor has not hired any African-American employees to

department head positions, even though qualified African-Americans have applied. However, Plaintiff has not identified these applicants and fails to point to any specific evidence regarding the positions for which these applicants applied or the qualifications of these applicants as compared to the individuals who received the positions. Furthermore, the Mayor has promoted or hired or approved the promotion or hiring of numerous African-Americans, including Cindy Barr, who was the first African-American female to be promoted to the position of Police Captain in the City. Berry Aff. ¶ 6. Berry avers that he nominated and supported an African-American candidate for the position of Municipal Judge although he did not receive enough votes from other members of City Council. Id. Berry further avers that he was Mayor when twenty African-Americans were hired and he approved the hiring of seven African-American police officers. Id.

Although Defendant presents legitimate, non-racial explanations for many of the perceived racial issues asserted by Plaintiff, such as the swearing-in ceremonies, the replacement of the African-American attorneys previously retained by the City, and the hiring of white and African-American employees, other evidence of racial animus exists that is sufficient to create an issue of fact with respect to whether Plaintiff's employment was terminated because of his race.

First, the Mayor admits that there have been numerous occasions where council votes have split along racial lines under both his administration and that of the previous Mayor. Berry Aff. ¶ 4. Additionally, in the light most favorable to Plaintiff, some of the issues he was not allowed to raise at the City Council meeting on October 12, 2010, were issues related to race. Specifically, Plaintiff attempted to discuss his dissatisfaction with the Mayor's hiring of two white police officers, and refusal to allow Plaintiff to hire an African-American as a police officer. Plaintiff Dep. pp. 32-34. Also, the council members supporting Plaintiff's version of events at the October 12, 2010, council meeting, Davis and Baker, are both African-American, while the members supporting Mayor

Berry's version of events, Betty Atkinson and Ron Atkinson, are both white. Davis Dep. pp. 28-29; 36. Additionally, following Plaintiff's termination, the Mayor hired a white male to replace Plaintiff as Chief of Police, even though there was also an African-American applicant who was well qualified for the position. Berry Dep. p. 107. Viewing this evidence in the light most favorable to Plaintiff, an issue of fact exists regarding Plaintiff's claim under Title VII. Accordingly, it is recommended that summary judgment be denied as to Plaintiff's Title VII race discrimination claim.

## V.    CONCLUSION

As to Plaintiff's claims under each theory advanced, FMLA, SCHAL, and Title VII, Defendant presents as it's legitimate, non discriminatory reason for Plaintiff's termination his conduct during the executive session of the City Council meeting held on October 12, 2010. As set forth above, an issue of fact exists as to what occurred during that meeting. Additionally, as set forth above, there is sufficient evidence, i.e., more than a scintilla, that the decision to terminate Plaintiff's employment was based upon Plaintiff's protected class or protected conduct. The court's role is not to weigh the evidence. Therefore, for the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (Document # 36) be denied as to Plaintiff's FMLA, SCHAL, and Title VII causes of action. However, as set forth in footnotes 1 and 2 above, the remaining claims raised in Plaintiff's Complaint should be dismissed, including all claims against Defendant Rodney Berry individually as abandoned by Plaintiff.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

August 8, 2013
Florence, South Carolina